STATE OF IOWA v. WM. MORTON, Appellant.

**Criminal law:** MURDER: EVIDENCE.  The evidence is reviewed and held
1  to sustain a conviction of murder in the second degree.

**Same:** SELF-DEFENSE: DUTY TO RETREAT.  Although one may be threat-
2  ened by another with a dangerous weapon, still if he has an opportunity to retreat he should avail himself of it before shooting his assailant.

*Appeal from Polk District Court.*—HON. W. H. MCHENRY, Judge.

TUESDAY, JUNE 23, 1914.

DEFENDANT was indicted and convicted of murder in the second degree, and appeals, alleging as the only ground for reversal that the verdict is not supported by the evidence.— *Affirmed.*

*George Cosson,* Attorney General; *John Fletcher,* Assistant Attorney General; *Thomas J. Guthrie,* County Attorney, and *Wm. Ayres* and *George Wilson,* Assistant County Attorneys, for the State.

*McHenry & De Ford, J. B. Rush* and *J. F. Conrad,* for defendant.

GAYNOR, J.—Defendant was indicted by the grand jury of Polk county charged with the crime of murder in the first degree in the killing of one William Morton, on or about the 8th day of March, 1913. The defendant entered a plea of not guilty, and upon trial to a jury a verdict was returned of guilty of murder in the second degree. Judgment having been pronounced upon the verdict, defendant appealed, and complains that the evidence did not justify the verdict.

It appears from the evidence in this case that the defendant and the deceased both belong to the colored race, and prior to the matter herein complained of, had known each other for a number of years. The defendant is thirty-nine years of age, and the testimony tended to show that, prior to this time, was a man of excellent reputation; that the deceased was a vicious, quarrelsome, and dangerous man, and was about sixty years of age; that on the night in question, deceased came to a saloon known as the Midway Saloon, situated on Fourth and Elm streets in the city of Des Moines; that the defendant was either there, or arrived soon after the deceased, in company with a woman known as Bella West with whom the defendant boarded; that the defendant entered the saloon and his companion remained at or near the door; that the defendant went in to see, and was engaged in conversation with some one, when his attention was attracted by a colloquy between Bella West and the deceased. The deceased was, at that time, more or less intoxicated. There is some controversy as to whether defendant or the deceased arrived at this saloon first.

1. CRIMINAL LAW: murder: evidence.

It appears that when the deceased arrived and discovered the presence of Miss West, he said to her, "You are the very woman I want to see." She was then at or a few feet from the door. When he said this to her, she said to him: "Go away; you are drunk." And he said, "If you say that again, I will hit you in your mouth, or smash you in the mouth," or words to that effect. She repeated her assertion, and he struck her and she fell against the wall. Defendant then came to the deceased and told him not to strike the woman; that she was a cripple, and words then passed between defendant and the deceased, and defendant drew his gun. There is a controversy as to how many times the deceased struck Miss West before the gun was drawn.

W. R. Jackson, witness in the case, testified substantially as follows:

Davis was in the saloon when this man Morton and Miss West walked in. Davis approached them and said, 'You are the very woman I want to see,' and she [Miss West] said: 'Go away; I won't have nothing to do with you; you are drunk.' Davis said, 'If you say I am drunk, if you say it again, I will hit you in your mouth.' She argued for a few minutes, and the defendant walked up to Davis and touched him on the shoulder and said, 'Don't you hit the woman.' Davis said: 'Yes; I will hit her if she says the same thing again.' They chewed the rag a few minutes. She mumbled it again, and he hit her twice. She was standing against the wall between the window and the door of the saloon, and the second time he hit her, deceased backed out of the door. Morton followed him. Morton pulled a gun from his pocket just as he was going towards Davis. It was a thirty-eight blue steel gun. I heard three shots. After the third shot, I went and looked out the door, and there was Davis lying in the street just off the walk. His foot was just over the curbing on the sidewalk, and he was lying right out in the street with his hands over his head. I did not pay any attention as to whether Davis had anything in his hand or not. I did not see what occurred when they were outside. I did not go out until it was all over. When I stepped to the door and looked out, Davis was lying something like seven feet from me. The sidewalk is about four feet wide.

One Antonio Romona testified that he was in the saloon at the time the shots were fired; that after the shots were fired he then went and saw the man lying dead about five or six yards south of the door.

W. L. Schaffer testified:

That deceased was lying about fifteen feet from the saloon door; lying in the street with his feet upon the walk.

The record discloses, without question, that the deceased and the defendant were both in this Midway Saloon just prior to the tragedy; that the deceased and this Miss West had some controversy, and that the deceased struck her and knocked her down; that the defendant then came to the deceased and warned him not to strike her again; that some talk then occurred between them; that they went out of the saloon. There is a controversy as to which went out first. There is a controversy as to when the defendant drew his gun. The testimony of the state tends to show that the defendant drew the gun, with which he took the life of the deceased, while still in the saloon; that when the gun was drawn by the defendant, the deceased backed out of the room; that the defendant followed; that three shots were fired by the defendant; that the deceased was then found lying outside the door of the saloon with bullet holes in his body. No one saw the shots fired. Many people heard the shots, and saw the dead man lying upon the ground immediately thereafter.

The defendant claims justification on the ground of self-defense. He claims that after he had admonished the deceased not to strike Miss West again, deceased told him, "I will hit her, and I will hit you." He ran his hand in his pocket and pulled out a knife. That when the defendant saw him with the knife, he backed away, and the deceased followed him. That he shot in self-defense. No knife was found in the hand of the deceased, and no one claims to have seen a knife in his hand, except the defendant and his companion. The only testimony for the defendant was given by the defendant and

Miss West. Their version of what happened does not differ materially from that given by the state, except in so far as it is claimed that the deceased drew a knife, and that the deceased followed him with a knife. Defendant claims that he did not pull the gun until after he left the saloon, and until he was pursued by the deceased with a knife.

The defendant testified:

I fired three shots. I could not tell what kind of handle the knife had, that Davis had in his hand, but it must have had a blade about six or seven inches long. I saw the blade. He held it with his right hand up in the air, about even with his shoulder, and the blade was pointed toward me. When he first came at me with the knife, I backed away, about four or five feet before I fired the first shot. I kept on backing, and went about the same distance before I fired the second shot: All the time, he was coming to me with this knife. He did not say anything. All the time I was about three feet from him. When I fired the third shot, he fell, and I immediately threw the pistol over the box car and started away. I fired because I thought he was going to cut me with the knife. I was scared of him. I knew his reputation as being a quarrelsome and dangerous man. I knew he was a vicious and dangerous man.

This is practically all the testimony bearing upon the real question as to whether the defendant was justified in taking the life of the deceased, on the ground of self-defense.

The defendant nowhere testifies, nor is there any testimony, that the deceased struck at the defendant with a knife, if he had one, other than is found in the testimony of the defendant himself, as hereinbefore set out.

2. SAME: self-defense: duty to retreat. The testimony of the state tends to show that the colloquy between the woman and the deceased was carried on near the door of the saloon; that after the defendant came to the place where the deceased and the woman were, and protested against the deceased's conduct towards the woman, the deceased struck the woman again; that thereupon the defendant pulled his gun; that the deceased backed out of the saloon; that the defendant followed

him. The jury might well have found that the shooting followed, and was the result of, the resentment which the defendant felt towards the deceased because of the outrageous conduct of the deceased towards his companion. The jury might well have found that the defendant killed the deceased, not in defense of his person, nor in defense of the woman, but because of the outrage he felt, towards the deceased, because of his brutal conduct in striking a crippled and defenseless woman. But, however much men may justify themselves in conduct such as is charged against the defendant, the law does not tolerate the ''Christless code'' that must have life for a blow. The way of retreat was open to the defendant, even upon his theory of the case, and he should have availed himself of it before taking the life of the deceased. Even assuming that the deceased drew a knife, held it in his hand, as defendant claims, yet the jury might have been justified in finding that the deceased drew the knife in defense of his own person, threatened as he was by the defendant armed with a deadly weapon.

However this may be, we are satisfied that the record justifies the verdict of the jury. They saw the witnesses, heard them testify, and observed their demeanor upon the stand. The judge who tried the case was in a position to judge of the credibility and weight to be given to the evidence far better than we are, and we do not feel that we would be justified in disturbing this verdict, upon the ground that the evidence does not support it; this being the only ground upon which the right to reversal is predicated.

We think the case ought to be, and is—*Affirmed.*

LADD, C. J., and WEAVER and WITHROW, JJ., concur.